IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:22-CR-060 (MLB) |
| MALACHI MULLINGS. | ) | |
| _____ | ) | |

**<u>SENTENCING MEMO</u>**

COMES NOW MALACHI MULLINGS, by and through counsel, and files this memo to be considered by this Honorable Court in conjunction with his Presentence Report (PSR) and all arguments, exhibits and allocution to be put forth at his sentencing hearing on Monday, May 20, 2024. Mr. Mullings asks that this information be used to fashion a below-guideline sentence which comports with the requirements of 18 U.S.C. §3553(a) and which is otherwise reasonable.

***Introduction:*** Malachi Mullings was born and raised in Hollywood, Florida, not far from the glamour and riches of South Beach, but also not far from the poverty and generational struggles of Liberia and Dania Beach. His father is a hard-working man who ran a car wash and mobile car detailing business. Some might say his mother suffers from delusions of grandeur. As a child, Malachi spent time helping his father wash the fancy cars of rich people. While by no means an excuse for his criminal conduct in this case, these factors provide some context

and partially explain how Malachi Mullings landed where he is today.

In this case Malachi Mullings has pleaded guilty to money laundering conspiracy (Count 1) and several substantive money laundering offenses (Counts 2-8). The government has always been clear - Malachi Mullings did <u>not</u> participate in the underlying fraud schemes or unlawful activities. Mr. Mullings is the sole defendant charged in this case. However, others were involved in the same money laundering scheme as well as the underlying fraud schemes, but were prosecuted elsewhere. Mr. Mullings' case is being prosecuted in the Northern District of Georgia by Assistant United States Attorneys from the Department of Justice's "Main Justice" office out of Washington, DC. As shall be discussed, COTEZS JACKSON, a Stone Mountain, Georgia, resident who laundered money for the same Nigerian group as Mullings, was sentenced in the District of Maryland to serve 12 months and a day. (See Ex. 1). ADEYANJU ADEWALE, participated in the underlying BEC and romance fraud schemes, including fraud on the Ohio Medicaid program[1], and was sentenced in the District of Maryland to serve 60 months and ordered to pay $4.2 million in restitution. (See Ex. 2). DAVID AMAO, aka "John Williams" aka "David Jones" pleaded guilty in the District of

---

[1] $310,000 in this case that came to Mr. Mullings through the John Williams Tech account. (PSR ¶ 36).

Maryland to the underlying fraud conduct, with a loss amount between 3.5 and 9 million, and was sentenced to serve 36 months and ordered to forfeit $4 million. (See Ex. 3). RAMON OLORUNWA ABBAS, aka "Hushpuppi," conspired to launder over three hundred million ($300,000,000). He stole and laundered several million through BEC takeovers and romance frauds, and was sentenced in the Central District of California serve 135 months in federal prison, and pay $1,732,841 in restitution. (See Ex. 4). In deciding upon a reasonable sentence for Mr. Mullings, this Court should avoid unwarranted sentencing disparities with these defendants who were involved in the same money laundering scheme.

## I) SENTENCING GUIDELINE ISSUES:

1) **Loss Amount. (Paragraphs 60, 30-52).** The probation officer calculates the Base Offense Level under USSG§2S1.1 (a)(2) as 8, plus 18 levels from the USSG§2B1.1(b) loss table, based upon a laundered funds value between 3.5 and 9 millions dollars. (PSR ¶ 60). Mr. Mulling objects to the probation officer's proposed loss amount of $6,736,748 and the methodology used to arrive at this figure. Specifically, Mr. Mullings objects to estimating the "value of laundered funds" simply by adding up every transaction that took place in every bank account owned by Mr. Mullings. This method overstates the value of the laundered funds. In response to Mr. Mullings' objection, the probation officer

3

writes the following:

> With regards to the counting of the defendant's losses, "calculating the harm simply based on the value of the [ill-gotten proceeds] that gave rise to these transactions would not take full stock of the harm caused to society." *United States v. Waked Hatum*, 969 F.3d 1156, 1169 (11th Cir. 2020). In *Waked Hatum*, the Eleventh Circuit granted substantial deference to a prior ruling, which found that "[e]ach unlawful monetary transaction harms society by impeding law enforcement's efforts to track ill-gotten gains." *United States v. Martin*, 320 F.3d 1223, 1227 (11ᵗʰ Cir. 2003). In *Martin* the court found that each of the defendant's ninety-seven money laundering transactions constituted a "separate harm to society," and affirmed the district court's calculation of losses totaling $1,055,068.21 based on a single stolen check worth $380,050.08. *Id.*

> As with *Martin*, each of the defendant's layered transactions constitutes a separate harm intended to stymie detection by law enforcement and to further "clean" the ill-gotten gains before they reached their final destination overseas.

(PSR ¶60).

Mr. Mullings respectfully disagrees. First, the issue in *Hatum* was only whether an order of forfeiture [$20,852,000] was required when there was no actual loss to the bank in that money laundering scheme. *United States v. Waked Hatum*, 969 F.3d at 1159. *Hatum* did not deal with loss amount or guideline calculations under USSG §2S1.1 and §2B1.1. Incidentally, Hatum was sentenced to serve 27 months after attempting to launder over twenty million dollars. *Hatum*, 969 F.3d at 1160. *United States v. Martin* involved a money laundering scheme carried out by an attorney who deposited stolen checks into his trust account. There, the government was able to directly trace the stolen funds as they were repeatedly deposited or transferred 97 times, resulting in a loss amount calculation

three time higher than the original $380,000 which was stolen. Mr. Mullings case is distinguishable. Here, the probation does not trace or tie the majority of Mullings' transfers and deposits to any specific check or amount of ill-gotten proceeds. The probation officer simply presumes that each and every dollar in each and every account came from the underlying romance fraud or BEC fraud. Such presumption is improper given the burden of proof still required of the Government. *See United States v. Liss*, 265 F.3d 1220, 1230 (11th Cir. 2001)(upon challenge, the government bears the burden of proving loss amount with reliable and specific evidence.)

Here, the probation officer's method results in unfair double and triple-counting in several situations. For instance, when a bank would close Mr. Mullings' account, it typically would issue a final cashier's check which he would then deposit into a new account. All of Mr. Mullings' accounts were in his true and legal name, and/or in the name of "The Mullings Group," a Georgia corporation, registered in Mr. Mulling's name. Transferring money into a different account bearing his own name, was not the same as the conduct in *Martin*. Furthermore, these transfers did not impede law enforcement's ability to track Mr. Mullings' ill-gotten gains. Transferring the remaining funds from closed accounts was not done to create a new layer of laundering, rather, these transfers were made

5

simply to keep the money. This is not a separate societal harm, it is the same

societal harm which should be punished only once. Such close-out transfers

occurred at least on the following occasions:

> 11/06/2019 Regionsbank (-3421) issued a close-out check of $30,000,
>
> 12/11/2019, Amerisbank (-2870)  issued a close-out check of $189,983.47,
>
> 3/20/2021, Wells Fargo (-3439) issued a close-out check of $19,772.99,
>
> 10/7/2020 Fifth-Third Bank (-9108) and issued a close-out check of $110,201.74.
>
> The total of these examples of close-out checks is $349,958.

Another example of unfair double-counting, actually of *quadruple-*

counting, relates to the purchase of the Ferrari. First, the fraud funds from victim

S.A., approximately $250,000 were deposited into Mullings account. Next the

funds went out to purchase the Ferrari. (PSR ¶41). The Nigerians were upset that

Mullings purchased the Ferrari so he sold it and deposited the funds back into his

account. These funds then were transferred back out of the account. In this

example, Mr. Mullings only laundered $250,000, but under the probation officer's

approach, he is being punished for this amount four (4) times, resulting in over-

representation by $750,000.

*The Better Approach.*

Mr. Mullings submits his criminal conduct is more appropriately measured

by adding up the monies deposited into his accounts by the BEC and romance fraud victims. In its PSR objections, the government has included the losses to STE Transport, with an additional $101,000 of diverted proceeds being deposited into Mr. Mullings' Citibank account. (PSR ¶36a). This additional amount from STE raises the total loss amount deposited in Mullings's accounts to 1,672,345.

| PSR ¶ | Deposited Amount | Victim |
|---|---|---|
| 36 | 310,000 | John Williams Tech |
| 36a | 101,000 | STE Transport |
| 38 | 48,000 | Vict RZ |
| 38 | 30,000 | Vict RZ |
| 39 | 390,000 | Vict SM |
| 40 | 250,000 | Vict ZR |
| 41 | 260,000 | Vict SA |
| 42 | 150,000 | Vict DC |
| 43 | 29,970 | Vict DD |
| 44 | 30,000 | Vict RG |
| 45 | 23,000 | Vict AP |
| 46 | 50,375 | Vict SS |
| **Total** | **1,672,345** | |

This total places Mr. Mullings between 1.5 and 3.5 million in loss amount. Mr. Mullings maintains his objection to being held accountable for the 1.2 million dollars laundered for the same group of Nigerians by Cotezs Jackson, described in PSR ¶¶ 32-34. A majority of these funds were outside of Mullings' scope of agreement as required under USSG §1B1.3 to be counted as relevant conduct. However, the Cotezs Jackson loss issue is somewhat moot as adding his 1.2 million does not change the guideline range.

7

The appropriate measure of Mr. Mullings' relevant conduct is between $1.5 and 3.5 million, under USSG §2B1.1(b)(I). His Base Offense Level should be reduced by 2 points, from Level 26 down to Level 24.

**2)** ***In the Business of Laundering.*** **(Paragraph 61).**

The 4-level enhancement under USSG §2S1.1(b)(2)(C) should not be applied to Mullings. The probation officer had it right the first time, before the government's PSR objection. It is the government's burden to prove the criteria for this enhancement. The application of USSG§2S1.1(b)(2)(C) is determined by considering the "totality of the circumstances." *See* Application Notes to §2S1.1(b)(2)(C). The six factors listed are - whether the defendant (1) regularly engaged in laundering funds; (2) laundered funds for an extended period of time; (3) laundered funds from multiple sources; (4) generated a substantial amount of revenue in return for laundering funds; (5) had a prior conviction for a money laundering related offense; or (6) made statements during the course of an undercover government investigation that he had engaged in any of the conduct listed in factors (1) (2), (3), or (4). USSG §2S1.1 cmt. n. 4(B).

In 2019, Malachi Mullings was a 26-year-old kid with a broken down truck, a bank account, and dream of being rich. There is insufficient evidence before the Court that he knowingly laundered funds from multiple sources. Everything he did

8

in this case, he did at the direction of the same Nigerian group including "Classic-Baggie," "Hushpuppie," and those prosecuted in the District of Maryland. While there were multiple victims, all the funds Mr. Mullings conspired to launder came through the same Nigerian fraud group. Admittedly, the going rate of pay was 10% of the funds deposited, however this one factor does not control the Court's analysis. Mr. Mullings does not have a prior conviction for money laundering. In this case, Mullings pleaded guilty to being involved in the money laundering conspiracy from 2019-2021, a period of two years. He did not regularly engage in laundering funds or do so for an extended period of time. Considering the totality of these factors, the enhancement does not apply.

The "business of laundering" enhancement was added to the Sentencing Guidelines in 2001 through Amendment 634. The Sentencing Commission analogized the business of laundering to a "professional fence." *See* USSG App. C, amend. 634 ("[S]imilar to a professional 'fence,' … defendants who routinely engage in laundering funds on behalf of others, and who gain financially from engaging in such transactions, warrant substantial additional punishment because they encourage the commission of additional criminal conduct.") Courts have adopted the "professional fence" analogy from the Commission's commentary in both published and unpublished opinions. See, e.g., *United States v. Mitchell*, 613

F.3d 862 (8th Cir. 2010); *United States v. Lazo*, 491 F. App'x 942, 944 (11th Cir. 2012).  To be "regularly engaged," the activity must be more than "isolated, casual or sporadic." *United States v. Tabares*, 2021 U.S. App. LEXIS 33619; 2021 WL 5279404 (11th Cir. 2021).

Under the totality of the circumstances, there is insufficient evidence to support the 4-level enhancement for Mr. Mullings being "in the business of laundering funds." To the extent that any such evidence exists, Mr. Mullings's culpability for such conduct is more than adequately accounted for in the Base Offense Level and the 16 Level increase for the value of the laundered funds.

It should be noted that Cotezs Jackson did not receive this 4-level enhancement for "being in the business of money laundering," nor did Adeyanju Adewale or David Amao in Maryland, nor did Ramon Abas, aka "Hushpuppie," in the Central District of California, however Adewale, Amao and Abas pleaded guilty to wire fraud, not money laundering, and thus were allowed to avoid application this four-level enhancement. (See Ex. 5, Adeyanju Adewale plea agreement, and Ex. 6, Ramon Abas transcript excepts).

**3) *Sophisticated Laundering*. (Paragraph 62).** Mr. Mullings objects to this 2-Level enhancement. He did not open his trucking company as a "shell corporation." It was a real company with a real truck. (See Ex. 7, photo of truck,

registration documents, lease documents to Star Motor Carrier and log records from 2018). Mullings' actions in this case were relatively standard and generic for a modern-day money laundering case. What may have been sophisticated 10 years ago is routine today. Sending the money offshore to Africa does not demonstrate sophistication on Mr. Mullings part. It was a geographic and desired necessity for the people in charge, the Nigerians. Furthermore, the use of Bitcoin was conceived and orchestrated by Cotezs Jackson, and did not demonstrate unusual sophistication.

Additionally, if the Court finds that the 4-level "in the business" enhancement of USSG §2S1.1 (b)(2)(C) applies, then the 2-level sophisticated means enhancement of USSG §2S1.1 (b)(3) does not. USSG §2S1.1 (b)(3) only applies when §2S1.1 (b)(2)(B) applies. USSG §2S1.1 (b)(2) directs the Court to "Apply the Greatest." It does not say mix and match and apply (b)(2)C) in one context, but (b)(2)(B) in another context. Either (b)(2)(B) applies or (b)(2)(C). The plain language of USSG §2S1.1 mandates that (b)(3), "sophisticated means" applies only if (b)(2)B applies. If (b)(2)(C) applies, (b)(2)(B) and (b)(3) do not.

**4) *Role in the Offense.* (Paragraph 64).** Mr. Mullings objects to the two-level aggravating role enhancement. While Cotezs Jackson was exposed to the Nigerians through Mullings, his roommate, Mullings did not direct or control

Cotezs Jackson's activities. Cotezs Jackson was his own man. He began as a hanger-on, but soon became a motivated self-starter, impressed by the money he saw flowing from the Nigerians. Jackson quickly developed direct contact with the Nigerians. Using Bitcoin to pay the Africans was his idea. Jackson admitted that he was the person who managed the money because Mullings was drunk and high all the time. Jackson and Mullings were roommates and at times partners. They both were directed and controlled by the Nigerian leaders above them.

*Request for minor role.*

Additionally, the Court should consider Mr. Mullings for a two (2)-level mitigating role under USSG §3B1.2 (b) as most of his money-laundering conduct was controlled and directed by the Nigerian higher-ups. In 2019, Mr. Mullings was 26 years old. Given his young age, mental health issues and naivety, it was easy for the Nigerians to control him. In fact, at one point when money went missing, the Nigerians threatened to kill Mullings. Compared to the Nigerian fraudsters above him, Mr. Mullings was less culpable than the average participant in this case.

**5) *Obstruction of Justice.* (Paragraph 65).** Mr. Mullings objects to this enhancement. Contrary to the government's argument, he did not provide materially false testimony at his motion to withdraw his guilty plea. He spoke his

truth as he knew and believed it. He did not intentionally lie. As this Honorable

Court noted in a different context at the evidentiary hearing, "You and I may have

two different perceptions of it. And they might both be accurate perceptions, I

guess." (Hearing Transcript, Doc. 92-45). Clearly there was distinct contrast in

what Mr. Mullings thought happened and what his attorneys said happened during

the break in his guilty plea proceedings. Mr. Malloy first said he could not recall

the conversation, but then pieced together some snippets. Ms. Temple said there

was an intense conversation with Mullings, but it happened at counsel table, not in

the hallway. Mr. Mullings said the conversation happened in the hallway and he

felt Mr. Malloy bullied and coerced him into pleading guilty. Clearly something

happened. Ms. Temple described Mr. Maloy as being intense and stern. After the

conversation, Malachi changed course and got through the plea colloquy.

To Malachi Mullings, a young man who had been bullied as a child, (PSR ¶92), a

young man suffering from anxiety, depression and bipolar disorder, it felt like he

had been bullied.

It is perhaps worth noting the timing and context of Mr. Mullings motion to

withdraw his plea and the testimony he gave. He moved to withdraw his guilty

plea less than two months after he pleaded guilty to all counts of the criminal

indictment, without a plea agreement. This was prior to the PSR being released,

and prior to sentencing. If successful in withdrawing his guilty plea, his case would not have been dismissed and he would not have been released from custody. Rather, Mr. Mullings would have had a jury trial or entered a new guilty plea, perhaps with more favorable terms than previously offered. Had the motion been granted, Justice might have been delayed, but it still would have been served.

     **6)** ***Acceptance of Responsibility.*** **(Paragraph 68, 51-53).** Mr. Mullings recognizes and agrees that he is not entitled to the full three (3) points available for acceptance of responsibility. However, he should receive a two (2)-level reduction. Mr. Mullings has never denied that he allowed the Nigerians to use his bank accounts to launder money. He freely and frequently admitted that he did this. He freely and voluntarily sat down with government, prior to indictment, and admitted his involvement. He told the government what he did, he gave them access to his phones, computers and passwords. He was debriefed by the government four (4) times. He has expressed[2] and continues to express his sympathy for the underlying fraud victims in this case. He provided information about others, some who have been prosecuted, and some who have not. He pled guilty to all counts of the indictment.

_____

   [2](Doc. 66, page 2, motion to withdraw guilty plea: "My heart goes out to all the victims in this situation and I would like to help them as well and bring down these guys giving everyone restitution and justice.")

It is true, he slapped his girlfriend after she spit in his face. (PSR ¶27). It is also true that he tried to withdraw his guilty plea after feeling like he was getting the "raw end of the deal" compared to Cotezs Jackson, who was sentenced to serve a year and day. While Mr. Mullings' post-plea decisions and fears were not rational, they were understandable given his young age and his mental health. In truth, Mr. Mullings created his own Hell as he let fear, paranoia and bad advice from jailhouse lawyers lead him to make bad decisions. His post-plea actions did not rise to the level of failing to accept responsibility for his money laundering crimes. He should receive a 2-level reduction under USSG §3E1.1.

## II)  <u>REQUEST FOR A REASONABLE AND LOWER SENTENCE:</u>

Although sentencing courts must still consider the Sentencing Guidelines, Congress has required federal courts to impose the least amount of imprisonment necessary to account for the considerations and accomplish the sentencing purposes set forth in Title 18 USC §3553(a). These include (a) the nature and circumstances of the offense and the history and characteristics of the defendant; (b) the kinds of sentences available, (c) the advisory Guidelines range; (d) the need to avoid unwarranted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of

adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational and vocational training, medical care, or other correctional treatment. *See Kimbrough*, 552 U.S. at 90. This statutorily mandated "parsimony provision" is not just another factor to be considered along with the other factors set forth in Section 3553(a) - it sets an independent limit upon the sentence.

Given the history and characteristics of Malachi Mullings and a variety of mitigating factors under §3553(a), including the need to avoid unwarranted sentencing disparities, a downward variance is appropriate. Mr. Mullings submits a below-Guideline sentence of 60 months is reasonable.

A) *Nature of the Offense.* Obviously, allowing Nigerians to launder more than a million dollars through one's bank account is a bad thing. The nature of the offense is serious. On one hand, some might argue that laundering the money allows the underlying crimes to succeed and encourages the continuation of BEC frauds and romance scams. On the other hand, Mr. Mullings did not commit any of the underlying crimes. He just allowed his bank accounts to be used, and he moved money and made transactions as directed by the Nigerians. He did not posses a weapon or threaten anyone during his crime. This was a non-violent offense. This was not a drug offense.

B) *The  History and Characteristics of Malachi Mullings.* Mr. Mullings
is a young man who suffers from anxiety, depression and bipolar disorder.
Prior to his arrest, he was treated for these mental health conditions by Dr. Bryon
Evans. (PSR ¶94). He also has been treated for his mental health conditions
while at the Robert A. Deyton Detention Center. He has also suffered from drug
and gambling addictions. (PSR ¶93,95). Mr. Mullings' criminal record, which
includes two misdemeanor battery convictions, suggests he also suffers from anger
management issues. (PSR ¶74,75). While in custody at Robert A. Deyton, Mr.
Mullings has sought to address this problem. He has completed an Anger
Management course as well as several other courses while at R.A.D. (*See* attached
certificates and transcripts, Ex. 8).

 *Adverse Childhood Experiences*. Mr. Mullings grew up in Hollywood,
Florida, watching his father wash and clean the fancy cars of rich people. (PSR
¶86). He nearly drowned when he was 5 years old. He experienced physical abuse
from his mother and was molested by the daughter of a family friend. (PSR ¶85).
He was bullied at school for being a well-spoken overweight kid. (PSR ¶92).
There was marital infidelity and drug abuse in the family home. His parents
separated in 1999. Around this same time, his father was treated for leukemia and
Malachi was sent to Delaware to live with his grandparents. (PSR ¶84). Despite

such adverse childhood experiences, and the troubling financial crimes involved in this case, there is hope that Mr. Mullings can turn his life around and be a productive member of society. Stephanie Humphries, a friend, writes the following in support of Mr. Mullings:

> Malachi possesses a genuine desire to make a positive impact on the world around him. I firmly believe that with the appropriate guidance and support, Malachi has the potential to become valuable asset to society and a beacon of hope for others facing similar struggles. He has already demonstrated his willingness to give back and contribute to the betterment of his community, and I am confident that given the opportunity, he will continue to do so in a meaningful and productive manner. In conclusion, I respectfully urge Your Honor to consider the circumstances surrounding Malachi's situation with compassion and understanding. I firmly believe that with the right guidance and support, he can overcome his current challenges and emerge as a responsible and contributing member of society. Thank you for your time attention.

(Ex. 9, letter from Stephanie Humphries).

Similarly, Malachi's father writes the following:

My name is Roger Mullings, and I am a mobile car detailer. I am writing to you today as the father of Malachi Mullings, whom I have raised from the day he was born. Throughout these years, I have witnessed Malachi grow into a young man who, despite his faults, is a loving, ambitious and kind individual.

Judge Brown, I do understand the seriousness of these allegations against my son and the impact they have had on the victims. This is all very unfortunate. I firmly believe that the fact that Malachi is young, gullible, and exercised poor judgement, along with his mental health struggles, drug, and alcohol abuse, have led him down this

path. With the right support and guidance, Malachi can become a mentor in the African American community. He has always been a person with a big heart, often going out of his way to help those around him. My son has volunteered at local organizations, assisted neighbors in need, and consistently shown a willingness to put others before himself.

Your Honor, I appeal to your sense of mercy and leniency and humbly ask that you consider the above factors in your sentencing. I pray that you may give my son an opportunity for rehabilitation which could bring a positive change in his life. As I approach my 60th birthday this August, my only wish is to see Malachi on the road to restoration. Thank you for taking the time to consider this father's desperate appeal

(Ex. 10, letter from Roger Mullings).

   C) *The Need to Avoid Unwarranted Sentencing Disparities.*

Cotezs Jackson was sentenced in the District of Maryland to serve 12 months and a day. Adeyanju Adewale, who committed the actual underlying BEC and romance fraud schemes, including fraud on the Ohio Medicaid program[3], was sentenced in the District of Maryland to serve 60 months and pay $4.2 million in restitution. David Amao, aka "John Williams" (as in "John Williams Tech") pleaded guilty in the District of Maryland to the underlying fraud conduct with a loss between 3.5 and 9 million. He was sentenced to serve 36 months and ordered to forfeit $4 million. Ramon Olorunwa Abbas, aka "Hushpuppi," conspired to

---

   [3] $310,000 in this case that came to Mr. Mullings through the John Williams Tech account. (PSR ¶36).

launder over three hundred million ($300,000,000) and stole several million dollars through BEC takeovers and romance fraud. Abbas was sentenced in the Central District of California serve 135 months in federal prison, and ordered to pay $1,732,841 in restitution.

Meanwhile, in the Northern District of Georgia, Edwin Owie, was sentenced to 56 months and ordered to pay $2,390,357.03 in restitution after pleading guilty to conspiracy to commit access device fraud and aggravated identity theft. Deborah McNeill, was sentenced to 48 months, and ordered to pay $2,390,357.03 in restitution. Osemwengie Imarhia, was sentenced to 30 months and ordered to pay $2,390,357.03 in restitution after pleading guilty to conspiracy to commit access device fraud. (See Ex. 11).

D) *Over-Representation of Criminal History.* Mr. Mullings is in criminal history category III, based upon four 1-point offenses. Given the comparatively minor nature of these convictions and their age, (the first two convictions are non-violent and are almost 9 years old), category II more appropriately represents the severity of his criminal history. Under USSG §4A1.3(b), a downward or lateral departure is warranted to correct for this over-representation.

E) *Consideration or Credit for Time Spent on Home Incarceration and Home Detention.*

Mr. Mullings was first arrested in this case on January 28, 2022. On February 2, 2022, he was granted an unsecured bond with the requirement of 24-hour-a-day **home incarceration**. (Doc. 14). On July 15, 2022, the bond condition was modified to **home detention**. (Doc. 43). Mr. Mullings remained on home detention until his bond was revoked on February 14, 2023. (Doc.58). If the Court were to credit or take into account all of this time spent on home incarceration and detention, it could reduce Mr. Mullings' sentence by 12 months and 17 days.

F) *Mr. Mullings Cooperated with the Government and Provided Assistance in the Investigation and Prosecution of Others.*

Pursuant to the terms of the proffer letter, the government will make known to the Court the extent and nature of Mr. Mullings' cooperation. He freely and voluntarily sat down with government, prior to indictment, and admitted his  involvement. He told the government what he did, he gave them access to his phones, computers and passwords. He was debriefed by the government four (4) times. He provided information about others, some who have been prosecuted, and some who have not.

### F) What is a reasonable sentence ?

Notwithstanding his objections above to the obstruction enhancement and the denial of points for acceptance of responsibility, Mr. Mullings recognizes that he must pay some price for moving (unsuccessfully) to withdraw his guilty plea.

21

He submits that a 24-month "penalty" is fair and reasonable. This withdrawal penalty should be applied on top of the sentence imposed on a similarly situated defendant.  David Amao, aka "John Williams," (as in "John Williams Tech and the Ohio Medicaid Program), was similarly situated if not more culpable than Mullings. David Amao was sentenced with a fraud loss amount between 3.5 and 9 million dollars, to serve 36 months. Thus, Malachi Mullings requests a total sentence of 36 plus 24 months, for a total of 60 months.

## **<u>CONCLUSION</u>**

Based upon the above, Malachi Mullings requests a total sentence of 60 months. He  requests a designation recommendation to a facility in southern

Florida, and that he be recommended for the RDAP program.


Dated:  This 14th day of May, 2024.


Respectfully submitted,

 s/ *L. Burton Finlayson*
L. BURTON FINLAYSON
Attorney For MALACHI MULLINGS.
Georgia Bar Number: 261460


LAW OFFICE OF
L. BURTON FINLAYSON, LLC
685 Linwood Avenue, NE, Suite 200A
Atlanta, Georgia 30306
(404) 872-0560
lbfcourts@aol.com

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day electronically served the foregoing

Sentencing Memo filing said in CM/ECF with automatic electronic

service and by email upon all parties of record including the following:

<div style="margin-left: 2em;">

Kelly Connors and Christopher Wenger
Assistant United States Attorneys
600 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, Georgia 30303


This 14th day of May, 2024.


**<u>s/ L. Burton Finlayson</u>**
L. BURTON FINLAYSON
Attorney For MALACHI MULLINGS.

</div>

24